# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JEANNIE M.,

               Claimant,

      v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

             Respondent.

No. 19 C 2603

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OPINION AND ORDER

Claimant Jeannie M.[1] ("Claimant") seeks review of the final decision of Respondent Kilolo Kijakazi,[2] Acting Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 8]. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c), and the parties have filed cross-motions for summary judgment [ECF Nos. 20, 30] pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, Claimant's

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Acting Commissioner Kijakazi as the named defendant.

Motion to Reverse the Decision of the Commissioner of Social Security [ECF No. 20] is denied and the Commissioner's Motion for Summary Judgement [ECF No. 30] is granted.

## PROCEDURAL HISTORY

On January 13, 2015, Claimant filed a Title II application for DIB alleging disability beginning on October 26, 2014. (R. 140–41). Her claim was denied initially and upon reconsideration, after which she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 107–16). On October 10, 2017, Claimant appeared and testified at a hearing before ALJ Kathleen Kadlec. (R. 31–58). ALJ Kadlec also heard testimony on that date from impartial vocational expert ("VE") Amy Mauri. (R. 58–73). On February 28, 2018, ALJ Kadlec denied Claimant's claim for DIB. (R. 13–25).

In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. §§ 404.1520(a), 416.920(a). At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since October 26, 2014, her alleged disability onset date, through her date last insured of March 31, 2016. (R. 15). At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c). (R. 15–16). Specifically, Claimant suffered from a reconstruction of a weight bearing joint in her lower left extremity. (R. 15–16). The ALJ also acknowledged several non-severe complaints – hypertension, depression, and anxiety – but concluded that those impairments caused no more than minimal vocationally relevant limitations. (R. 16–17). In so

2

concluding, the ALJ considered whether Claimant's mental impairments created any functional limitations to satisfy the "paragraph B" criteria," and opined they did not. (R. 16–17). In understanding, remembering, or applying information, the ALJ found Claimant has no limitation. (R. 16). In interacting with others, the ALJ also concluded Claimant has no limitation. (R. 16). Regarding concentration, persistence, and pace, the ALJ determined Claimant has a mild limitation, citing to Claimant's self-report that she could pay attention for only one to two hours at a time. (R. 16). The ALJ considered the opinion of state agency psychological consultant Dr. Richard Hamersma that Claimant had a moderate limitation in this area, but afforded Dr. Hamersma's opinion only partial weight because it conflicted with the record evidence. (R. 17). Finally, in adapting or managing oneself, the ALJ assessed that Claimant has no limitation. (R. 17).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17–18). In particular, the ALJ considered listings 1.02, 1.03, and 1.06. (R. 17). Regarding listing 1.02, the ALJ reviewed the requirements and concluded that Claimant did not meet the requisite involvement of one major peripheral weight bearing joint, resulting in the inability to ambulate effectively as defined in 1.00B2b. (R. 18). According to the ALJ, the medical evidence showed that Claimant did rely on crutches for a short time after her injury and accompanying surgeries; however, she was advised to resume weight-bearing as tolerated in April of 2015. (R. 18). The ALJ also pointed to evidence in the record that as soon as October of 2015, Claimant was able to walk without an

assistive device at a normal pace, albeit with a moderately antalgic gait on the left. (R. 18). As for listing 1.03, the ALJ similarly concluded that Claimant did not meet the requirement of being unable to ambulate effectively. (R. 18). Nor was listing 1.06 met, as there was no evidence of a fracture of the femur, tibia, pelvis, or one of more of the tarsal bones with solid union not evident on medical imaging, and the inability to ambulate effectively. (R. 18).

The ALJ then found Claimant had the RFC,[3] through her date last insured, to:

> "perform sedentary work as defined in 20 CFR 404.1567(a) except: foot controls frequently bilaterally; occasional ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no ladders, ropes, or scaffolds; no work at unprotected heights; only occasional exposure to moving mechanical parts and operation of a motor vehicle; and only occasional exposure to vibrations." (R. 18).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a sales or real estate agent. (R. 22). This past relevant work exceeded Claimant's residual functional capacity, which provided for sedentary work with additional limitations, and so the ALJ opined she could no longer perform it. (R. 22). At step five, the ALJ concluded that, considering her age, education, past work experience, and residual functional capacity, Claimant is capable of performing other work within the national economy and that those jobs exist in significant numbers. (R. 23–24). Specifically, the VE's testimony, on which the ALJ relied, identified jobs including a document preparer, final assembler, or ticket counter. (R. 23). The ALJ

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

then found Claimant was not under a disability from October 26, 2014, the alleged onset date, through the date last insured of March 31, 2016. (R. 24). The Appeals Council declined to review the matter on February 22, 2019, (R. 1–6), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); see, e.g., *Smith v. Berryhill*, 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

When a claimant files an application for disability benefits, he or she bears the burden under the Social Security Act of bringing forth evidence that proves his or her impairments are so severe that they prevent the performance of any substantial gainful activity. 42 U.S.C. § 423(d)(5)(A); *see Bowen v. Yuckert*, 482 U.S. 137, 147–48 (1987) (citing 42 U.S.C. § 423(d)(1)(A)). A five-step inquiry controls whether an individual is eligible for disability benefits under the Social Security Act, which the Seventh Circuit has summarized as follows:

> The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy."

*Butler v. Kijakazi,* 4 F.4th 498, 501 (7th Cir. 2021) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); 20 C.F.R. §§ 404.1520, 416.920). Claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Gedatus v. Saul,* 994 F.3d 893, 898 (7th Cir. 2021); *Wilder v. Kijakazi,* 22 F.4th 644 (7th Cir. 2022).

5

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also,* 42 U.S.C. § 405(g); *Fowlkes v. Kijakazi*, 2021 WL 5191346, at *2 (7th Cir. 2021). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. But even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not build a "logical bridge" from the evidence to the conclusion. *Wilder,* 22 F.4th at 651 (citing *Butler v. Kijakazi,* 4 F.4th 498, 501 (7th Cir. 2021)). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by

6

reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *see also, Gribben v. Kijakazi,* 2022 WL 59404, at *2 (7th Cir. 2022) ("We do not reweigh the evidence or resolve conflicts in it."). "[O]nly if the record compels a contrary result" will the court reverse the ALJ's decision. *Fowlkes*, 2021 WL 5191346, at *2 (quoting *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010)).

## ANALYSIS

Claimant argues three points of error on appeal. First, she contends that the ALJ erred in evaluating listings 12.04, 12.06, 1.02, 1.03, and 1.06 and that the ALJ's perfunctory analysis at step three, as Claimant characterizes it, constitutes reversible error. Second, Claimant charges that the ALJ did not appropriately assess Claimant's subjective symptom statements. Finally, Claimant cursorily argues that there were gaps in the information provided in the hypotheticals to the VE that require remand.

### I.    The ALJ's Listing Level Analysis at Step Three

Claimant asserts that the ALJ erred at step three when she concluded Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listing level impairment. In particular, Claimant faults the ALJ for her substantive analysis of listings 1.02, 1.03, and 1.06, and for not specifically mentioning listings 12.04 and 12.06. Because the ALJ satisfied her burden at step three, and because Claimant fails to provide any meaningful detail or argument about listings 1.02, 1.03, 1.06, 12.04, or 12.06 that would afford a basis for

this Court to disturb the ALJ's opinion, Claimant's argument on this point is without merit.

The listings detail "impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a); *see also,* 20 C.F.R. § 404.1529(d)(3). It is Claimant's burden to show not only that her impairments meet a listing, but that her impairments satisfy all of the various criteria specified in the listing. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). When evaluating a claimant's condition and a listed impairment, an ALJ must discuss the listing by name and offer "more than a perfunctory analysis of the listing." *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004) (citing *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2002); *Scott v. Barnhart*, 297 F.3d 589, 595–96 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). However, the ALJ need not "name and discuss every Listing in their written decisions," *Wilder*, 22 F.4th at 652, nor does she need to mention every piece of evidence, so long as she builds a logical bridge from the evidence to her conclusion. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

### A. Listings 1.02, 1.03, and 1.06

Turning first to the limitations involving Claimant's left knee, the ALJ identified the three listings at issue – 1.02, 1.03, and 1.06 – and described with particularity why Claimant did not meet them. She articulated clear support from

the objective medical evidence for her conclusion, and correctly emphasized that it was dispositive for all three listings that Claimant did not meet the requirement of not being able to ambulate effectively. (R. 18) ("[Listing 1.02] also requires involvement of one major peripheral weight bearing joint resulting in the inability to ambulate effectively as defined in 1.00B2b. While the claimant used crutches following her injury and surgeries, she did not have the inability to ambulate effectively pursuant to section 1.00B2b (2F/3)."); ("Listing 1.03 was not met, as there was no evidence of reconstructive surgery or surgical arthrodesis of a major weight-bearing joint with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or was not expected to occur, within 12 months of onset."); (Listing 1.06 was not met, as there was no evidence of a fracture of the femur, tibia, pelvis, or one or more of the tarsal bones with…inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or was not expected to occur, within 12 months of onset."). Section 1.00B2b defines the inability to ambulate effectively as "having insufficient lower extremity functioning…to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b. As the ALJ reasoned, the medical evidence of record showed that Claimant could, in fact, ambulate effectively within the meaning of Section 1.00B2b.

Claimant's disability onset date of October 26, 2014 corresponds with a motorcycle accident in which Claimant sustained serious injuries to her left knee, including displaced fractures of the left tibia and fibula. Immediately after the

accident, Claimant underwent surgery to address those injuries. (R. 291–99). After her initial surgery, she continued to express pain and was advised to remain non-weight bearing on her left leg and keep her knee locked and extended in a brace. (R. 1784–85). She had surgery to address a soft tissue infection a few months later, in February of 2015, and had no difficulty ambulating in a locked brace at the time of discharge. (R. 312) (2/26/15) ("42y female admitted for IV abx for soft tissue infection with Dr. Lack, William, MD. The surgery went well without acute complications...On the day of discharge, the patient was medically stable, ambulating without difficulty, voiding spontaneously, tolerating a diet without nausea or vomiting, and pain was well controlled on PO pain medications."); (R. 313) (2/26/15) ("You may resume activities as described: Protected weight bearing with walker or crutches with rehab brace locked in extension so knee does not bend."). In April of 2015, she again underwent planned surgery and again, on the date of her discharge, she was ambulating "without difficulty" and advised to resume weight bearing as tolerated. (R. 836-37) (Claimant's discharge summary dated 4/24/15: "42 y female admitted for planned left leg elevation of flap (plastic surgery), left tibia removal of intramedullary nail and screws, irrigation and debridement, revision tibial intramedullary nail with Dr. Lack, William, MD. The surgery went well without acute complications...On the day of discharge, the patient was medically stable, ambulating without difficulty, voiding spontaneously, tolerating a diet without nausea or vomiting, and pain was well controlled on PO pain medications.").

Claimant's progress notes after April of 2015 consistently reveal improvements in Claimant's ability to ambulate. (R. 934–35) (5/15/15) ("She is alert and cooperative

10

in no acute distress. Her knee comes fully straight and flexes to 100 degrees. All of her wounds are well-healed. She has no drainage or signs of infection. She has good sensation in all dermatomes and dorsiflexes her ankle to a neutral position. Her motor groups are firing appropriately. PLAN: At this time, a new physical therapy order will be written to focus on unlimited active and passive knee range of motion out of the brace. The knee brace will remain locked in extension when ambulating. She will be weightbearing as tolerated with the brace locked in extension."); (R. 938–39) (6/15/15) ("She has been walking some with the TROM locked in extension and using crutches, and this has been going well. She denies pain today…I discussed with her that she should increase her weightbearing and is now weight bearing as tolerated."). By October of 2015, less than a year after her accident, she was able to walk without an assistive device at a normal pace. (R. 957–58) (10/05/15) ("She reports pain is improving, now off narcotic pain medication, now walking without crutches and has changed from TROM brace to smaller soft knee brace…moderately antalgic gait on left, able to walk without assistive devices at normal pace."); (1823–24) (4/04/16) ("She has been working on strengthening and feels she is walking better, although frustrated she still can not reciprocate stairs…Gait: walks with slight limp, but does so without assistive devices or knee brace, walks at moderate pace."); (1830–31) (10/03/16) ("Gait: milk limp on ambulation walks without assistive device…We had an extensive conversation in which I counseled her regarding her radiographs (reviewed these with her) and that it appears she has achieved union of her fracture radiographically. Given her pain, it is difficult to judge clinical union, as there may be multiple reasons for her pain separate from her fracture given known plateau

11

fracture, patellar tendon injury, and proximal tib-fib dislocation. I counseled her that given the severity of her injuries, it is likely she can still improve if she continues to strengthen and increase activities. In fact, she states she has continued to improve throughout this year, including now being off all narcotics.").

In sum, Claimant presents no medical evidence beyond her own hearing testimony that she was not able to ambulate effectively within the meaning of 1.00B2b. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (at step three, the ALJ cannot substitute a claimant's allegations of pain or other symptoms for a missing or deficient sign or laboratory finding, such as objective medical evidence, to raise the severity of an impairment to that of a listed impairment) (citing 20 C.F.R. § 404.1529(d)(3)). By contrast, the objective medical evidence to which the ALJ cited, and Claimant's subjective reports to her treating physicians in 2015 and 2016, supports the ALJ's conclusion that Claimant did not meet that requirement of listings 1.02, 1.03, and 1.06. That no treating or examining physician identified findings equivalent in severity to the criteria of listings 1.02, 1.03, or 1.06 also supports the ALJ's conclusion, as is the fact that neither state agency consultant opined a listing level condition. *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009). Again, it is Claimant's burden now – as it was at the hearing – to bring forward something more than conclusory statements that she "could in fact meet or equal Listings 1.02, 1.03, and 1.06" without supporting record evidence. [ECF No. 21] at 10. Because Claimant has not done so or demonstrated specifically how she meets or medically equals the three listings at issue, the Court will not overturn the ALJ's reasoned conclusion that

Claimant's impairments, considered both individually and in combination, did not meet or equal the criteria of listings 1.02, 1.03, or 1.06.

### B. Listings 12.04 and 12.06

Claimant next argues that the ALJ incorrectly assessed Claimant's mental limitations in the context of listings 12.04 and 12.06 and characterizes the ALJ's assessment of the paragraph B functional criteria as inadequate. In this Court's view, the ALJ supported her conclusion that Claimant did not meet or medically equal any listing, including listings 12.04 and 12.06, with substantial evidence after a fulsome analysis of the paragraph B criteria. As with listings 1.02, 1.03, and 1.06 discussed above, it is Claimant's burden to show not only that her impairments meet listings 12.04 and 12.06, but that her impairments satisfy all of the various criteria specified in the listings. *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999); *see also, Sullivan v. Zebley,* 493 U.S. 521 (1990); SSR 91–7c at 4. Yet Claimant here presents minimal evidence beyond her own subjective symptom reports and cherry-picked observations from the state agency consultant's evaluation that her depression and anxiety satisfy the criteria of listings 12.04 and 12.06. The Court therefore finds no error in the ALJ's step three analysis on this point, as discussed further below.

A claimant "suffering from an affective disorder meets the listed severity level for a depressive syndrome if enough listed factors (the 'A criteria') are present." *Larson v. Astrue*, 615 F.3d 744, 747-48 (7th Cir. 2010) (quoting 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04(A)). Once the "paragraph A" criteria are satisfied, a claimant must also meet either the "paragraph B" or "paragraph C" criteria of that listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. The "paragraph B" criteria require

the presence of at least two of the following for a claimant to be considered per se disabled: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04(B); *see also, Craft*, 539 F.3d at 674-75; *Larson*, 615 F.3d at 748. Alternatively, a claimant may satisfy "paragraph C" of the listing, which involves a medically documented history of a chronic applicable disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04(C).

Although her disability function report states she suffers from depression and anxiety, Claimant provided few, if any, treatment records or objective medical evidence regarding her mental health diagnoses or mental limitations during the relevant period. The initial state agency physician attempted to schedule a mental status consultative examination to elucidate the nature and extent of Claimant's limitations arising from these diagnoses, but he was rebuffed, as Claimant herself

14

disclaimed any disability resulting from her mental impairments. (R. 78) ("CONSULTATIVE SOURCES: After scheduling a MSW CE the CLMT contacted me insisting that her depression and anxiety are not a part of her disability. She wants the decision to be made just on her physical impairments using MER from her treating sources."). The state agency physician at the initial level could therefore do no more than merely note the fact of Claimant's diagnoses of depression and anxiety. (R. 78). Claimant agreed at the reconsideration level to undergo a consultative evaluation, where Dr. Mark Langgut, Ph.D. became the first physician of record to examine Claimant's mental status, document Claimant's subjective complaints regarding her mental health, and make some independent observations of the same. (R. 89, 963–66). In the end, the ALJ was left to rely on four sources of information in evaluating Claimant's four functional areas: Claimant's subjective symptom reports, records from Claimant's visits with her treating physicians briefly noting her mental status, Dr. Langgut's consultative examination at the reconsideration level, and the opinion of state agency psychological consultant Dr. Hamersma, also at the reconsideration level. (R. 16–17).

Dr. Langgut's consultative examination in particular provided valuable information about Claimant's mental limitations. Dr. Langgut noted – and both the ALJ and Dr. Hamersma credited – Claimant's self-reported feelings of hopelessness, lethargy, sleep problems, irritability, and frequent tearfulness, as he also confirmed Claimant's diagnoses of major depressive disorder and anxiety disorder with panic features. (R. 89, 966). Claimant also self-reported to Dr. Langgut that she has never seen a psychiatrist or psychologist for her depression and anxiety, nor has she had

15

ER visits or hospitalization for the same. (R. 89, 964). Dr. Langgut then independently observed that although Claimant was emotional during the evaluation, her activity level during the interview was normal and she demonstrated no abnormal behavior. (R. 89, 965). Any obsessive ideas or ruminating ideations were mild, except for a moderate phobia of travel. (R. 91, 966). Dr. Langgut also observed that Claimant had intact memory skills and judgment, intact basic computational skills, adequate insight into her own situation, a clear consciousness, and that she was oriented in all spheres. (R. 89, 965). Claimant had intact immediate recall ability and both her short-term and long-term memory functioning were intact – Claimant was able to recall the previous day's weather, what she had eaten for dinner the evening before, the directions taken to Dr. Langgut's examination, three recent presidents, and the first president of the United States. (R. 965). Finally, Dr. Langgut noted that Claimant appeared able to manage any funds she might receive, as she had demonstrated adequate judgment, responsibility, arithmetic reasoning skills, and the ability to understand the effects of her actions on herself and others. (R. 966).

Based on Dr. Langgut's independent observations and Claimant's self-reported symptoms, Dr. Hamersma assessed that Claimant had no limitations of note in any functional area, other than a moderate limitation in her ability to maintain attention and concentration for extended periods and her ability to carry out detailed instructions. (R. 95–96). Claimant's particular concentration deficits could, Dr. Hamersma believed, be accommodated by a restriction to tasks with simple, routine instructions. (R. 95–96). Ultimately, neither state agency physician opined a listing-level impairment related to Claimant's mental limitations. (R. 78) ("12.04 – Affective

Disorders[:] There is insufficient evidence to substantiate the presence of a disorder. 12.06 – Anxiety-Related Disorders[:] There is insufficient evidence to substantiate the presence of a disorder."); (R. 91) (same).

Relying, to varying degrees, on the above-mentioned objective medical evidence and Claimant's subjective reports, the ALJ conducted a fulsome analysis of Claimant's mental limitations and the "paragraph B" criteria described above using the special technique outlined in 20 C.F.R. § 404.1520a. *Craft*, 539 F.3d at 674. The ALJ first evaluated Claimant's symptoms, 20 C.F.R. § 404.1520a(b)(1), and determined that the symptoms of Claimant's depression and anxiety amounted to a medically determinable impairment. (R. 16). The ALJ then rated the degree of limitation Claimant was experiencing across four areas. *Id.* § 404.1520a(c)(3). Turning first to understanding, remembering, or applying information, the ALJ noted that although Claimant self-reported problems with her memory to Dr. Langgut, no objective medical evidence or activities of daily living substantiated a limitation in this area. (R. 16, 89). The ALJ also found Claimant had no limitation in interacting with others, as Claimant herself testified that she socialized, was able to maintain friendships, and appeared to have no difficulty communicating with doctors or staff in treatment settings. (R. 16). In concentrating, persisting, or maintaining pace, the ALJ balanced Claimant's self-reported difficulty concentrating with the objective medical findings that Claimant exhibited no such difficulty in her activities of daily living, during visits with her treating physicians, or during Dr. Langgut's consultative examination. (R. 16). Although she departed from Dr. Hamersma's opinion in this regard, she correctly pointed out that Dr. Hamersma's assessment of

a moderate limitation in this area was based entirely on Claimant's self-reports, as no observations by Dr. Langgut, Claimant's treating physicians, or third parties substantiated a limitation in this functional area. (R. 91) ("Psych CE – Dr. Langgut – 09/11/15…[Claimant] demonstrated intact memory skills and judgment…Her consciousness was clear and she was oriented in all spheres. She had intact basic computational skills. She had an adequate degree of abstract reasoning skills…"); (R. 92) ("[Claimant] does indicate difficulties with memory and concentration. She indicates that she has no difficulties with handling stress or changes in routine. Third party ADLs indicated claimant's condition does not affect her memory, concentration, understanding, following instructions, or getting along with others. She indicated that claimant's [sic] has no problems handling stress or changes in routine."); (R. 16–17) (citing R. 865, 934, 935, 949–50, 1906)). And she was entitled to discount Dr. Hamersma's opinion on this point, having supported her conclusion with substantial evidence. (R. 16–17). Finally, with regard to adapting or managing oneself, the ALJ noted that Claimant handled stress and changes in routine well and that she did not need any reminders to take care of her personal needs or grooming, and found that Claimant had no limitation. (R. 17).

Based on the above findings – in particular, that Claimant had either no limitations or only mild limitations noted in the four functional areas – the ALJ reasonably concluded that Claimant's medically determinable mental impairments were non-severe, and she supported that assessment with substantial evidence. (R. 17) (citing 20 CFR 404.1520a(d)(1)). After concluding Claimant's mental impairments were not severe and that they did not, in combination with any other impairment,

result in work-related limitations beyond a mild impairment in concentration, persistence, or pace, it then became unnecessary for the ALJ to specifically evaluate whether Claimant's impairments met or equaled listings 12.04 or 12.06. *Alesia v. Astrue,* 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("the ALJ need not consider whether Claimant medically equals a listed mental disorder unless he concludes at step two that she has a severe mental impairment.").

Although Claimant now argues she does in fact meet listings 12.04 and 12.06, she does no more than cherry-pick certain self-reported symptoms and make blanket assertions that she satisfies the listings as a result. This does not satisfy Claimant's burden at step three, *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990), nor does it provide the Court any meaningful avenue to disturb the ALJ's finding now. As described above, the ALJ addressed Claimant's depression- and anxiety- related symptoms, though she did not assign the significance to them that Claimant would prefer when she assessed no limitation in three functional areas and only mild limitation in the fourth. Ultimately, because the ALJ supported her conclusion that Claimant had no more than mild work-related mental limitations with substantial evidence and followed the steps required of her as part of the special technique in 20 C.F.R. § 404.1520a, her analysis and conclusion will stand.

## II.    Claimant's Subjective Symptom Statements

Claimant next asserts that the ALJ improperly weighed Claimant's subjective symptom allegations when she concluded that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent" with the medical evidence and other evidence in the record. (R. 19). She

argues that the ALJ should have given more weight to her complaints of "severe pain," and specifically urged this Court to disturb the ALJ's credibility assessment because "[p]ain can be severe and disabling even in the absence of 'objective' medical findings." [ECF No. 21] at 13–14. However, the ALJ gave "specific reasons supported by the record" for discounting Claimant's subjective symptom statements and was not patently wrong in doing so. *Deborah M. v. Saul,* 994 F.3d 785, 789 (7th Cir. 2021). For that reason and as described further below, the Court declines to overturn the ALJ's credibility determination.

As noted above, an ALJ's evaluation of a claimant's subjective symptom statements is afforded "special deference" and will be upheld unless it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *see also, Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "SSR 96–7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain." *Maske v. Astrue*, 2012 WL 1988442, at *11 (N.D. Ill. 2010). First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96–7p., 61 Fed. Reg. at 34484. Second, if there is such an impairment, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id*. at 34485. The ALJ must justify his or her subjective symptom evaluation with "specific reasons supported by the record,"

*Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017).

When Claimant filed for disability benefits in January of 2015, she "indicated that she was no longer able to work due to multiple fractures to the lower left leg and multiple injuries to the left knee, severe anxiety and depression, nerve damage to the left leg, and wheelchair bound with no weight bearing." (R. 19) (citing R. 74). She stated that she could not walk, or that if she did so with crutches, she could walk for no more than two to five minutes. (R. 19). At the hearing in October of 2017,[4] Claimant testified that she still suffers from constant leg pain with swelling and discoloration, and that she cannot stand for even thirty minutes or walk for prolonged periods. (R. 19). As the ALJ noted, however, the objective medical evidence tells a different story, and the ALJ properly considered the extent to which the objective medical evidence supported the degree of severity of Claimant's subjective complaints; the duration, frequency, and intensity of the pain; medications taken; and treatment. *Scheck*, 357 F.3d at 703 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

To that point, the ALJ explained that after Claimant's surgeries, Claimant "had, with conservative treatment, regained sufficient mobility consistent with the

---

[4] As the ALJ noted and as Claimant does not dispute, the relevant period of disability ended March 31, 2016, about a year and a half before Claimant's hearing.

21

assigned residual functional capacity." (R. 21). For example, Claimant testified in October of 2017 that she could not walk for long, even with the use of a cane; however, the records show that Claimant was advised to resume weight bearing as tolerated in April of 2015, and only a month later, was noted to have good sensation and mobility in her knee and a forward plan to focus on unlimited active and passive knee range of motion out of the brace. (R. 934–35) (5/15/15) ("[Claimant] is alert and cooperative in no acute distress. Her knee comes fully straight and flexes to 100 degrees. All of her wounds are well-healed. She has no drainage or signs of infection. She has good sensation in all dermatomes and dorsiflexes her ankle to a neutral position. Her motor groups are firing appropriately...She will be weightbearing as tolerated with the brace locked in extension.). She was noted to be walking without an assistive device and at a normal pace by October of 2015, less than a year after her traumatic accident. (R. 21, 957–58) (10/05/15) ("She reports pain is improving, now off narcotic pain medication, now walking without crutches and has changed from TROM brace to smaller soft knee brace...Well appearing woman in no distress, alert and appropriate in conversation...Left knee ranges from 0 to 110 actively with no extensor lag, 5-/5 strength in left quad with only mild discomfort today in clinic, knee stable to varus/valgus and with Lachman, no knee tenderness except anteriorly over the proximal tibia she has mild tenderness...moderately antalgic gait on left, able to walk without assistive devices at normal pace...").

Similarly, although Claimant stated that she was experiencing leg swelling that required elevation every five minutes, the medical evidence did not indicate Claimant experienced clubbing, cyanosis, edema, or erythema, nor did Claimant's

treating physician make mention of the need for Claimant to elevate her legs during their relationship throughout the relevant period. (R. 21). Indeed, most, if not all, of Claimant's examinations in 2015 revealed that Claimant had progressively improved range of motion, intact sensation, and normal strength. (R. 21). Simply put, the medical evidence largely belied the severity of limitations Claimant described in her disability application and to which she testified at the hearing. Claimant's complaints of constant, severe pain and near-immobilization are not borne out by the notes and records of her treating physicians, and the ALJ was entitled to consider as much. So too was it proper for the ALJ to consider the course of Claimant's treatment, 20 C.F.R. § 404.1529(c)(3)(v), as well as Claimant's improvement over time with the assistance of medication, knee brace adjustments, and conservative post-surgery care recommended and implemented by her treating physician.

The ALJ also relied on evidence that Claimant's activities of daily living suggested she was not as disabled during the relevant time period as she portrayed herself to be. True, there are "limits on an ALJ's use of a claimant's daily activities to undermine assertions of disabling symptoms." *Prill v. Kijakazi,* 23 F.4th 738 (7th Cir. 2022). Indeed, the Seventh Circuit has "cautioned ALJs not to equate such activities with the rigorous demands of the workplace." *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (citations omitted). "But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated." *Id.* (quoting *Loveless*, 810 F.3d at 508). Here, the ALJ was not wrong to consider Claimant's testimony at the hearing that, despite Claimant's claimed limitations related to standing, sitting, and

walking, Claimant was able to take care of her personal grooming, start her laundry (though she testified she could not fold it afterwards), do dishes, go to the store with her son, and drive (although it made her tired to drive for over an hour). (R. 44–48); *Prill*, 23 F.4th 738. The record evidence at the reconsideration level also is in accord. (R. 91–92) ("ADLs – She can prepare simple meals. She can go out alone but no longer drives. She shops and is able to manage her financial affairs. She has limited social activities.").

In sum, Claimant offers only vague assertions of disabling pain that are insufficient to overturn the ALJ's credibility determination on the standard of review before this Court. Unlike this Court, the ALJ "had the opportunity to observe the claimant testifying, and, as Justice Jackson rightly observed more than a half-century ago, 'a few minutes observation…in the courtroom is more informing than reams of cold record.'" *Brenda L. v. Saul,* 392 F. Supp. 3d 858, 864 (N.D. Ill. 2019) (quoting *Ashcraft v. State of Tenn.,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)). All that is required of the ALJ is that she explain her subjective symptom evaluation "in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). She did so here, particularly given credibility determinations are due special deference as factual findings. *Scheck*, 357 F.3d at 703.

### III.    The RFC and the Hypotheticals Posed to the VE

Finally, Claimant cursorily argues that the ALJ did not account for all her limitations in the RFC. Though largely undeveloped,[5] Claimant's argument appears to be that the ALJ did not specifically address her mild limitations in concentration, persistence, or pace in her hypotheticals to the VE or the RFC itself, and that this requires remand. It is, of course, true that all of Claimant's limitations must be incorporated into both the hypotheticals posed to the VE and the ALJ's RFC assessment. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014). "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe[.]" *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). This includes mental limitations, as "'[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work.'" *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008) (quoting 20 C.F.R. § 404.1545(c)). However, it does not follow that an ALJ's RFC analysis must also include a discussion of functional categories for which she has found no limitation. *See, e.g., Johnson v. Colvin*, 2014 WL 7336460, at *4 (E.D. Wis. 2014) ("[T]he ALJ did

---

[5] The Seventh Circuit has made it clear that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Crespo v. Colvin,* 824 F.3d 667, 673 (7th Cir. 2016). The Court could reject Claimant's argument that the ALJ did not account for all her limitations in concentration, persistence, or pace in the RFC on this basis alone, [ECF No. 21] at 15–16; [ECF No. 32] at 7–8, but it nevertheless will address Claimant's RFC argument on the merits as well.

not find any limitations at all, and as such it was perfectly sensible to leave the heart conditions out of the RFC entirely.").

The question the Court has now shouldered, whether adequately presented by Claimant or not, is one that has sometimes resulted in remand in other cases. Other judges in this district have concluded, under different facts, that the failure of an ALJ to either include mild limitations in concentration, persistence, and pace in the RFC, or to explain why such inclusion was not necessary, requires correction. *See, e.g., Muzzarelli v. Astrue*, 2011 WL 5873793, at *23 (N.D. Ill. 2011) ("If the ALJ believed that the mild limitations in [concentrating, persisting, or maintaining pace] did not merit a non-exertional limitation in the RFC, he was obligated to explain that conclusion so that we can follow the basis of his reasoning."); *Hearan v. Berryhill*, 2018 WL 3352657, at *3 (N.D. Ill. 2018). But here, if the ALJ erred in failing to directly explain why she did not include a restriction for Claimant's mild[6] limitation in concentration, persistence, or pace in the RFC, that error is harmless because the

---

[6] In her argument that the ALJ did not correctly analyze whether she met a listing, Claimant briefly challenged the ALJ's conclusion that she had only a mild limitation in concentration, persistence, or pace. [ECF No. 21] at 7–8. To the extent that argument also could apply to Claimant's undeveloped argument here, the Court continues to find the argument unpersuasive. The ALJ considered, to varying degrees, Claimant's testimony, notes from Claimant's treating physicians, Dr. Langgut's consultative examination, and Dr. Hamersma's opinion before ultimately concluding Claimant has only a mild limitation in this area. (R. 16). In so doing, the ALJ pointed to specific evidence in the record as support for her disagreement with Dr. Hamersma that a mild, rather than a moderate, limitation was warranted. (R. 17). Claimant argues that the ALJ did not cite to any medical evidence to support that conclusion. [ECF No. 21] at 8 ("the ALJ does not refer to any medical evidence that would compel the determination of 'mild.'"). Not only is that statement inaccurate, (R. 16–17) (citing R. 865, 934, 935, 949–50, 1906), but Claimant herself cites to no record medical evidence to refute the ALJ's conclusion or, in Claimant's words, to "compel" a different conclusion. As previously discussed, the record evidence – including Dr. Langgut's examination notes and Claimant's third-party function report – substantially supports the ALJ's conclusion that Claimant has no more than a mild limitation in her ability to concentrate. (R. 89, 964–66).

ALJ included non-exertional limitations in her hypothetical to the VE – a restriction to only "simple, routine tasks and simple work-related judgements" – that accounted for Claimant's mild concentration limitation. (R. 61). The VE, who affirmed that she heard Claimant testify first-hand about her difficulties concentrating, confirmed that the unskilled jobs[7] available to someone with Claimant's exertional limitations still would be available to someone with the hypothetical non-exertional limitations posed by the ALJ. Whether or not the ALJ specifically incorporated those hypothetical non-exertional limitations into the RFC, the result in this case would be the same: sedentary, unskilled jobs are available in the national economy to someone with Claimant's exertional and non-exertional limitations. *See, e.g., Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021) ("Normally a failure to apply the correct legal standard requires us to remand the case to the ALJ for further proceedings. But if the error leaves us convinced that the ALJ would reach the same result on remand, then the error is harmless and a remand is not required. In making this determination, we look to the record to see if we can predict with great confidence what the result on remand will be.") (internal citations and quotations omitted). The harmless error in this case therefore does not compel remand, as explained in greater detail below.

The ALJ posed the following hypotheticals to the VE in this case. First, the ALJ asked the VE if an individual of Claimant's age and education, and with Claimant's past work history, would have jobs available in the national economy if

---

[7] A restriction to simple instructions also is inherent in the definition of unskilled work. *See* SSR 85-15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.").

the individual was limited to light work with the following limitations: "foot controls frequently bilaterally, then also occasional ramps and stairs, as well as balancing, stooping, kneeling, crouching, and crawling. No ladders, ropes, or scaffolds. No work at unprotected heights, only occasional exposure to moving mechanical parts and operational motor vehicle, and only occasional exposure to vibrations." (R. 60). The VE concluded that an individual with those limitations could perform Claimant's past work as a cleaner or housekeeper, or alternatively, as a hand packager, office helper, or cashier. (R. 60–61). The ALJ then added in mental limitations of only simple, routine tasks and simple work-related judgments, to which the VE replied that the same previously cited occupations would remain. (R. 61). Next, the ALJ reduced the type of work from light to sedentary with the same exertional limitations identified in her first hypothetical, such as only occasional ramps and stairs. (R. 61). The VE identified jobs including a document preparer, final assembler, and ticket counter. (R. 61). The ALJ then followed up with the same non-exertional limitations she inquired about with the light work hypothetical – only simple, routine tasks and simple work-related judgments – and the VE confirmed all three occupations would remain. (R. 62) ("Q: …and then again, let's add in the same – the same non-exertional limitation as we did in the second hypothetical. Is there any work for this hypothetical in the national economy? A: Yes, your honor. All three of the occupations cited at the sedentary level would remain.").

Based on the above exchange, the ALJ's lapse in ultimately failing to include a non-exertional limitation in the RFC was harmless given the ALJ's substantive inclusion of non-exertional limitations in her hypotheticals to the VE. Even if the ALJ

had incorporated the non-exertional limitation both she and Dr. Hamersma intended to address Claimant's limitations in concentration, persistence, or pace into the RFC, it would not have changed the VE's conclusion in this case that Claimant was capable of performing unskilled work available in the national economy.[8] And the record evidence supports the conclusion that unskilled work with a limitation to simple, routine tasks accommodates Claimant's particular needs in this arena. *See generally, Dudley v. Berryhill,* 773 F. App'x 838, 842 (7th Cir. 2019); *O'Connor-Spinner,* 627 F.3d 614, 619 (7th Cir. 2010). The longitudinal evidence, including the only medical opinion of record from Dr. Hamersma regarding Claimant's functional limitations, shows that the nature of Claimant's particular functioning limitation lies with her concentration. In response to questioning about her mental limitations at the hearing, Claimant testified that she had a "hard time concentrating or focusing." (R. 47). And Dr. Hamersma, after having considered Dr. Langgut's examinations, noted that Claimant's only limitations in the category of "concentration and persistence" were moderate limitations in the "ability to carry out detailed instructions" and the "ability to maintain attention and concentration for extended periods." (R. 95). Conversely, he noted no significant limitations in Claimant's ability to perform at a consistent pace, perform activities within a schedule, be punctual, make simple work-related decisions, sustain an ordinary routine without special supervision, or to carry

---

[8] As described *infra,* Dr. Hamersma opined that Claimant had a moderate limitation in her ability to maintain attention and concentration for extended periods and her ability to carry out detailed instructions. (R. 95–96). Although this exceeds the ALJ's conclusion that Claimant had no more than a mild limitation, Dr. Hamersma nevertheless believed Claimant's concentration limitations could be accommodated by a restriction to tasks involving simple, routine instructions. (R. 96).

out very short and simple instructions. (R. 95–96). And no medical opinion of record identified non-exertional limitations greater than those suggested by Dr. Hamersma and ultimately included in the hypothetical to the VE.

The evidence of record shows, then, that Claimant has depressive and anxiety-related symptoms that affect her ability to concentrate. Dr. Hamersma, who credited Claimant's subjective reports of concentration issues and opined that Claimant had greater concentration limitations than the ALJ herself ultimately accepted, believed that those concentration limitations could be accommodated by a restriction to tasks with simple, routine instructions. (R. 96) ("Due to claimant's depressive symptoms and chronic pain she would be able to carry out simple, routine instructions but would have some difficulty with detailed ones."). A limitation to simple, routine tasks is precisely the hypothetical the ALJ posed to the VE here, and for which the VE identified unskilled jobs that would still be available. And it is inherent, as noted above, in the definition of unskilled work that the work only requires the ability to understand, carry out, and remember simple instructions. SSR 85-15. The VE also listened to the Claimant's testimony at the hearing, and so she presumably heard Claimant agree that she had trouble concentrating and focusing before she identified jobs available in the national economy for an individual of Claimant's age and with her exertional limitations. (R. 47, 59). The Court is satisfied, therefore, that she was apprised of Claimant's concentration limitations through the hearing testimony and the ALJ's non-exertional hypothetical when she identified unskilled jobs at the sedentary level that still would be available in the national economy for someone limited to simple, routine tasks. That is enough to convince the Court that

30

notwithstanding her error, the ALJ would reach the same result on remand if she included (or explained her reasons for not including) non-exertional limitations in the RFC. *Lambert v. Berryhill,* 896 F.3d 768, 776 (7th Cir. 2018).

The Court has taken into consideration the weight of circuit precedent on this point and believes that those cases encourage a fact-specific analysis that, when conducted here, yields a harmless error result.[9] Most cases in which remand was required for a failure to expressly address a mild limitation in concentration, persistence, or pace in the RFC involved skilled or semi-skilled work. *See, e.g., Simon-Leveque v. Colvin,* 229 F. Supp. 3d 778, 787–88 (N.D. Ill. 2017) (a mild limitation in concentration, persistence, or pace could impact the ability to work as a brokerage clerk, a skilled position); *Alesia v. Astrue,* 789 F. Supp. 2d 921, 933–34 (N.D. Ill. 2011) (skilled work); *President v. Berryhill,* 2018 WL 4282053, at *3 (N.D. Ill. 2018) (information clerk, which is a semi-skilled position); *Hovi v. Colvin,* 2013 WL 3989232, at *16 (W.D. Wis. 2013) (semi-skilled or skilled work). But here, the VE identified only unskilled jobs for an individual with Claimant's exertional and hypothetical non-exertional limitations. And as borne out in *Simon-Leveque, Alesia,*

---

[9] In a recent case that was remanded for a multitude of issues, including a failure to accommodate a mild limitation in concentration, persistence, or pace in the RFC, Judge Harjani foreshadowed the path the Court has charted in this case, where remand was not already a foregone conclusion for "numerous" other errors. *See, e.g., Charles B. v. Saul,* 2019 WL 3557055, at *6 (N.D. Ill. 2019) ("The Court recognizes that the VE testified that [the claimant] could perform the sedentary jobs she identified if he was also limited to understanding, remembering, carrying out, and performing simple, routine tasks involving only simple, work-related decisions, with the ability to adapt only to routine work place changes. Because the numerous errors detailed in this opinion require remand, the Court need not address whether the ALJ's error in failing to include [the claimant's] mild limitation in concentration, persistence, or pace in the RFC is harmless given the VE's testimony in this regard.") (internal citations omitted).

*President, Hovi,* and the SSA regulations themselves, the ability to perform unskilled work may not require the same ability to concentrate, persist, or maintain pace as the performance of semi-skilled or skilled work. 20 C.F.R. § 404.1568(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time…a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."); 20 C.F.R. § 404.1568(b) ("Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work."); 20 C.F.R. § 404.1568(c) ("Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced…Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity.").

At the end of the day, although the ALJ should have directly addressed Claimant's mental limitations in her RFC or explained her reasons for not doing so, her error in not doing so here is harmless given the VE's testimony that the same jobs would be available for someone with the non-exertional limitations identified by the ALJ and as supported by the conclusions of Dr. Hamersma, who is the only medical expert to have opined on this particular issue. Remand therefore is not required.

**CONCLUSION**

Claimant's Motion to Reverse the Decision of the Commissioner of Social Security [ECF No. 20] is denied and the Commissioner's Motion for Summary Judgment [ECF No. 30] is granted.

It is so ordered.

_____

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:    February 17, 2022